We are going to go on to the last case, case number 22-2433, Catherine Erdman versus the City of Madison. May it please the court, my name is Jeff Olson and I In 2014, of the men who appeared to take the Madison Fire Department physical abilities test, the PAT, 84% passed. Only 14% of the women passed. That means women passed at 16% of the rate that men passed at. Nationally, looking at the 88% of women passed that test. That's 77.4% of the male passing rate for the CPAT. That's not equal, but it's a lot closer to equal than the Madison test. So how good does the CPAT have to be as a test to require the City of Madison to switch as the PAT even. The law is it has to be substantially equally valid. That means, according to this court's Allen versus City of Chicago case, that it would also serve the employer's legitimate interest in efficient and trustworthy workmanship. That's a low burden. And the CPAT has a heck of a pedigree. It was promulgated by the International Association of Firefighters, the International Association of Fire Chiefs, and modified after negotiations with the Equal Opportunities Commission to make it fairer to women. So why did the district court say the CPAT was not proven to be as good as the Madison test? This was a hard case for the district court. It took three and a half years to issue a decision, but it doesn't have to be a hard case for this court. If you look at the reasons the district court advanced, they just don't make any sense. One difficulty the district court pointed to was the need to do a transferability study. Well, if you look at the CPAT, it says what that study involves, and it's just surveying the duties of the firefighters on your fire department, surveying the equipment, and if the duties and the equipment are pretty close to the duties and the equipment in the ten fire departments that participated in creating the CPAT, then you get your transferability license from the testing organization. That's an easy burden. Madison did essentially the same thing during, in connection with the 2013 validation of the PAT. It looked around to see if Madison firefighters duties were similar to those of other departments, and of course they are, because we know that they are similar from all departments one to another. The second thing the district court pointed to was that Madison firefighters have a high passing rate out of the fire academy, and from that the judge apparently assumed that if you use the candidate physical ability test, they wouldn't pass out of the academy at such a high rate, and therefore the CPAT is an inferior test, but there's no evidence that they wouldn't pass at a high rate. Mr. Olson, what do we make of the fact, the next factor, that Madison has about as high a ratio of female firefighters as any major city in the country? Well, as the case is, what the district court wants you to infer from that fact is that if Madison used the CPAT, it wouldn't have as high a ratio of female firefighters, because other departments that use the CPAT don't have as high a proportion of female firefighters as Madison does, but there's no reason to connect the use of the CPAT to those lower proportions of firefighters in other departments. There could be lots of other reasons. Who has the burden of proof on this issue? We do. Is there any evidence in this record comparing the learning and practice effects for the No, there is no evidence showing quantitatively how much the learning and practice that is provided for the CPAT, which includes tutored run-throughs by people helping you master the techniques, and timed run-throughs so you get practice before you have to do your final test, and those were the things that were demanded by the EEOC when they reached their conciliation agreement with the two organizations that promulgated the test, but there isn't any quantitative evidence as to how much they help. It's just widely believed and understood that they do help a lot, and they help women and firefighters, candidates of shorter stature, more than they help big strong men. Mr. Olson, I'm not asking you to go beyond the record, but is there anything in the record about what other Wisconsin urban municipalities use for PAT versus CPAT? For example, what does Milwaukee use? I don't know about Milwaukee, but of course Janesville uses the CPAT. That's where Ms. Erdman is a firefighter, and she took that at a vocational school that it runs the CPAT for numerous fire departments around the state. A lot of fire departments don't put their own testing on. They use the vocational school CPAT. Okay, thank you. Now, presumably had the PAT not been used in 2014, more of the 28 women who tested would have passed. In addition to Ms. Erdman, does that bear on the I don't think it does. You can speculate about that, but let's say instead of four women passing the PAT, you use the CPAT and ten women passed. There is no reason to believe that most or all of them would not have been hired because of the City of Madison's very strong and publicly repeated desire to increase its representation of female firefighters. That's what accounts for all four being hired when four pass. No reason to believe it wouldn't apply if ten pass. I'd like to save my time for rebuttal. Thank you. Good afternoon, Your Honors. Attorney Storm Larson on behalf of the defendant Appelli, the City of Madison. By way of summary this afternoon, what I should be affirmed in part and reversed in part. And if I might begin my presentation to you all this morning with the section of the decision on which we are seeking reversal, it's our position that the District Court improperly denied summary judgment to the City of Madison based on an erroneous understanding of what Title VII is required at the prima facie. This is about the whole test versus particular exercises, right? Excuse me, Your Honor? This is about the whole test versus particular exercises, correct? Correct. So can you point us to any precedent beyond the Easterling decision in which that issue was not actually disputed that supports your view on that? Your Honor, we cited the Davis versus Cintas case from the Sixth Circuit, which we believe grapples with the statutory ambiguity regarding what a specific employment practice is. And what did it do? What did Davis do? Davis remanded to the District Court for further factual findings. And I think the District Court's opinion on this issue justifies why this case provides a tidy vehicle for this Court to resolve lingering ambiguity about what constitutes a specific employment practice for Title VII. Your Honors, in this case there is no serious dispute that had Ms. Erdmann performed just four more repetitions on the seventh and final event of the MPAT, the Madison Physical Abilities Test, that she would have continued on in the hiring process. There is no serious dispute in this case either that each of the seven events in the MPAT constitutes something that was individually scored, individually timed, and represented a sudden death scenario whereby any applicant who did not meet the minimally acceptable score on any of the seven events was immediately disqualified from consideration further on in the process. Do you think any evidence presented at trial is relevant to assessing the specific employment practice question here? I think it is, Your Honor, to the extent that there is evidence in the record about why it was important for the District, for the City of Madison, to structure its test the way that it was. Each of the seven events were specifically selected based on a content valid study which demonstrated why those events were being tested and how they simulated duties that a firefighter would be expected to do in the field. And if the trial evidence is relevant to that, how does the question amount to one that is, quote, a pure issue of law that you could appeal where you could appeal the pretrial denial and satisfy Dupree versus Younger? Your Honor, we think that it's relevant for the reasons that I stated but we still believe that this is a pure application of the Title VII's command that an individual separate out specific employment practice that is the cause of the disparate impact. Although we don't view this as a mixed question of fact and law, this court can certainly look at the myriad of evidence that the District Court reviewed to the extent that it was relevant for why the... Sorry, including trial evidence? Excuse me? Including trial evidence. I think you can take a look at that, Your Honor, but I think... How do you square that with Dupree? Your Honor, I'm afraid that issue was not briefed below so I'm hesitant to comment too much on it. However, we do view it as a... It would not have been briefed in the District Court because it's not a District Court issue. It's a question of your ability to appeal a denial of summary judgment when we've got a more developed record after trial. And Dupree, at least the way I read it, seems to tell us that if the trial record has meaningful input, the facts are relevant for that question, then the pretrial denial of summary judgment is moot. Your Honor, I may have misspoken earlier. What I was intending to state was that the the trial evidence was relevant to the extent that it informed this court's understanding of what the events entailed and not necessarily whether this court can sit in judgment on a question of law as Title VII's statutory command towards the efficacy of the MPAT as a tool that the city has been using. So, I apologize if there was confusion on that. Mr. Olson, do you know what the City of Milwaukee uses to test? No, Your Honor. I'm not aware of what the City of Milwaukee uses. Well, it isn't in the record, obviously, but it is the CPAT. So, I want to ask you, why is there not, at the very least, an issue of fact as to whether Ms. Erdman would have been hired in 2014, given the 100% higher rate for the candidates who passed the PAT? The city was obviously keen to hire women. Your Honor, a couple of responses to that. The district court observed that for individuals, and this I think the words of the district court, the argument proved too much that it was a 100% certainty that Ms. Erdman would have been hired but for the MPAT. Your Honor, the fact of the matter is that the third-stage burden of the disparate impact burden shifting framework, the district court found that there was, quote, overwhelming evidence about the reasons why the MPAT satisfied the city's own needs. Take, for instance, the stair mill event, Your Honor. There was, I think, Chief Davis testified at length regarding the specific events and that the CPAT used a lower number of repetitions on the stair mill than the City of Madison's stair mill event required, which reflected the average height of a Madison building that an individual be required to ascend in case of a fire emergency. Look, whether, I mean, you know, with respect to whether the CPAT would meet the needs of the Madison Fire Department, look, of course I can appreciate why the city thinks that a test it designed itself is, you know, the best match for its needs, but given that the CPAT was designed on behalf of ten different jurisdictions and it appears to me that the CPAT has a substantial history of successful use by many other jurisdictions, I have a hard time imagining why it could not meet the needs of the city. The CPAT is so unique about firefighting in Madison that a test in nationwide use, including, well, it's not in the record, so I won't mention why, cannot meet the city's needs. Your Honor, as this court observed in Ernst, quote, courts are generally less competent than employers to restructure business practices and unless mandated to do so by Congress they should not attempt it, end quote. The evidence in the record is substantial enough, and this court is sitting on a review of a clearly erroneous standard of review as to the reasons why the district court found that the PAT not only has had a wonderful success rate with having a large number of female candidates that the city of Madison is very proud of, but also the fact that it has gone through multiple iterations with subject matter experts in the field to be revalidated over a number of years and that the events that the MPAT actually uses have been tailored to the city of Madison's needs. I've noted the stair mill event already with the average height of a city of Madison building. That's not the only one, though. For example, a zigzag maneuver is used, I MPAT, which more accurately reflects a single resident's home that a firefighter would be required to enter potentially in a fire emergency situation, whereas the CPAT uses a straight drag. So, Your Honor, the CPAT is simply not testing the same sorts of characteristics and events that experts since at least 1997 have found to be efficacy rate. Mr. Larson, could I ask you about the question about the costs associated with either the transferability study for CPAT or the costs of implementing it with practice sessions and overtime and so on. My impression, maybe I'm wrong, but my impression was the district court got those things somewhat mixed up in the evidence. In the evidence decision? With what Judge Amasqua, or Chief Amasqua, had said about the subject. So, are you asking specifically about what the cost would be to perform a transferability study? And the district court's handling of that evidence, yes. Your Honor, we're not, we don't dispute that a transferability study may be feasible with the city of Madison. However, it's not our burden to prove that an additional requirement would be something that the city of Madison has to set forth to demonstrate the efficacy of a test that's been around since at least 1997. There are no further questions. I see that my time has expired. Thank you very much. Thank you, Your Honor. Okay, Mr. Olson. I think I've got about three points I want to make and I would like to make a few comments about the high representation of women in the Madison Department. There could be lots of explanations for that. It could be the affirmative action at the final selection stage where Madison makes a point of selecting women at a higher rate than they select men. It could be that other departments, other portions of their selection procedures, other than the CPAT, are biased against women, resulting in fewer hires of women in those departments. Could be that women face disappointments or toxic cultures in other departments and don't last as long in those other departments as they do in Madison for reasons having nothing to do with their physical abilities. There's no reason to believe that anything to do about the CPAT explains Madison's high representation of female firefighters. There was some talk about the degree to which the Madison test exactly replicates the duties of Madison firefighters. I think the court has to take cognizance of the fact that the uniform guidelines caution against approving a test because of its exact replication of duties and skills that can be learned in training or on the job. And that's the case certainly in many of these matters where we're talking about the replication here. Finally, with respect to the costs of implementation, Chief Emescua did testify that it would cost a lot of money to run a test the way the CPAT is run with coaches coaching people on their practice rounds and then giving people two timed run-throughs before they do their final test. She didn't testify as to how much, she just said it'd be a lot of money. But you know there was something the city could do to diminish those costs and it did in fact do in subsequent years and that's to change the order of the selection process. Subsequent years, the city gave the physical abilities test only after the chief's interview and only if you were offered a job by the chief subject to your testing did you get to take the test. That resulted in far fewer people taking that test. I always thought they did that because they were trying to defeat our ability to make a statistical showing but it also had to substantially reduce the cost of administering the test and that would have allowed probably switching to the CPAT and still saving money. Thank you. All right, well thank you very much. Thanks to both Mr. Olson and Mr. Larson. The case will be taken under advisement. Of course, the court will now be in recess until tomorrow morning at 930 and thank you all very much. Bye bye.